UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMADO, INC., d/b/a CENTRAL BEVERAGE COMPANY, an Illinois corporation, | ) ) ) | |
| | ) | Case No. 08 C 1146 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Dow |
| | ) | Magistrate Judge Ashman |
| HEDINGER BRANDS, LLC, an Indiana limited liability company, | ) ) | |
| | ) | |
| Defendant. | ) | |

**HEDINGER BRANDS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Hedinger Brands, LLC ("Hedinger Brands"), by its attorneys, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby submits its Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment.

**I.      FACTUAL BACKGROUND.**

A.      The Parties.

1.      DAD'S® root beer has been sold in the United States for 71 years, since 1937. (Exhibit 1, Hedinger Decl. ¶ 3). On January 12, 2007, Hedinger Brands acquired the proprietary formulae, trademark and distribution rights in DAD'S® root beer from The Monarch Beverage Company, Inc. ("Monarch"). (Ex. 1, Hedinger Decl. ¶ 4).

2.      The Dad's Root Beer Company, LLC is licensed by Hedinger Brands to sell and market DAD'S® root beer products. (Ex. 1, Hedinger Decl. ¶ 4). At the time of the acquisition, Monarch distributed the DAD'S® product through several distributors, including Pamado, Inc.,

d/b/a Central Beverage Company ("Central Beverage"). (Ex. 1, Hedinger Decl. ¶ 5, Exhibit 2, Nootbaar Decl. ¶ 3).

3.     Central Beverage is a beverage distributor in the Chicago area. (Ex. 2, Nootbaar Decl. ¶ 4). It distributes a variety of brands, including Old Style, Pabst Blue Ribbon, Colt 45, Arizona Teas and LaCroix water. (Ex. 2, Nootbaar Decl. ¶ 5).

4.     On or about February 6, 2006, Monarch and Central Beverage executed a Trademark License and Distributor's Agreement (the "Agreement") that authorized Central Beverage to distribute Monarch products, including those bearing the MOXIE ENERGY™, ALLSPORT™ and DAD'S® trademarks under terms and conditions defined by the Agreement. (*See* Agreement, attached to Ex. 1, Hedinger Decl. as Exhibit A).

5.     The portion of the Agreement relating to distribution of DAD'S® products was assigned by Monarch to Hedinger Brands on January 12, 2007. (Ex. 1, Hedinger Decl. ¶ 8). Hedinger Brands did not acquire rights in the MOXIE ENERGY™ or ALLSPORT™ products. (Ex. 1, Hedinger Decl. ¶ 9).

B.     The Agreement At Issue.

6.     The Agreement placed on Central Beverage the obligation to "use its best efforts to promote, develop and service the market for the Beverages throughout the Territory and [] maintain and operate warehouses or other facilities, trucks, and other equipment as are adequate to meet all requirements for the sale and distribution of the Beverages within the Territory." (Ex. 1, Hedinger Decl., Ex. A, Agreement, ¶ 5.2).

7.     The Agreement also required Central Beverage to "[m]aintain inventories of Beverages which the parties mutually agree will be adequate to meet demand for Beverages in the Territory." (*Id.*, ¶ 5.4(e)).

8.      "Territory" was defined by the Agreement as a portion of the State of Illinois including the southern part of Chicago.  (*Id.*, Schedule "C").

9.      The Agreement further provided:

> 1.0     Company hereby grants the exclusive right, except as set forth below to Distributor, to distribute and sell only in the restricted territory, defined and described in Appendix "C" (the "Territory"), only the package sizes listed in Appendix "B", and only the beverages listed in Appendix "A" (hereinafter referred to as the "Beverages").
>
> (a)     The Distributor's right to sell and distribute Beverages in the Territory shall be exclusive except that the Company reserves the right to sell Beverages to chain or multiple outlets with operations in the Territory and one or more operations outside the Territory (hereinafter called the "National Account Customers") for an invasion fee of $1.00 per case for the accounts listed in Appendix D.

(*Id.*, ¶1.0.)

10.     Appendix D to the Agreement lists one account:  Walgreen's.  (Id., Schedule D). Appendix D was never amended.  (Ex. 1, Hedinger Decl. ¶ 10).

11.     The Agreement provided that it may be terminated by Hedinger Brands for a number of reasons, including:

> (d)     Failure of the Distributor to pay to the Company approved source the price or prices of the Beverages.

(Ex. 1, Hedinger Decl., Ex. A, Agreement, ¶ 7.2(d)).

12.     Paragraph 7.3 of the Agreement provides that the Agreement may be terminated for reasons other than those set forth in Paragraph 7.0, 7.1 or 7.2.  Paragraph 7.3 provides:

> 7.3     The  Company may terminate this Agreement for any other reason than those listed in sections 7.0, 7.1 or 7.2 or for no reason at all, upon 90 days' written notice to the Distributor, or by virtue of non-renewal under section 1.4. Such termination will be effective as of the expiration of such 90 day period.  In lieu of any other claim Distributor may have with respect to such termination by the Company, Distributor shall be entitled to receive compensation for each case sold by Distributor during the twelve month period ending on the date termination of this Agreement becomes effective.  In the event this Agreement has been in effect for less than 12 months, the cases sold for purposes of compensation will be

3

annualized.  This per case compensation shall be a minimum one times [sic] per case gross margin.  In the event this Agreement is terminated within 12 months of the sale or assignment of the Company's rights under this Agreement, this amount shall be doubled.  The payment of such compensation shall be deemed to be in full and complete satisfaction of all claims and causes of action Distributor may have relating in any way to the termination hereof.

(Ex. 1, Hedinger Decl., Ex. A, Agreement, ¶ 7.3).

      C.    The Pending Dispute.

13.     In the spring of 2007, Central Beverage complained that Hedinger Brands was breaching the Agreement by allowing DAD'S® branded products to be sold to Jewel/Osco stores located in Central Beverage's Territory.  (Ex. 2, Nootbaar Decl. ¶ 6).

14.     Central Beverage raised this issue again when it met a representative of The Dad's Root Beer Company, LLC at a trade show on October 1 and 2, 2007.  (Ex. 2, Nootbaar Decl. ¶ 7).  Central Beverage contended that any sales to Jewel/Osco in the Territory "should have been through Central or if not, an invasion fee is owed to Central."  (Spagnola email of 10/11/07, attached to Ex. 1, Hedinger Decl. as Ex. B).

15.     Hedinger Brands denied these claims, stating that the plain language of Paragraph 1 of the Agreement allowed Hedinger Brands to sell Beverages to "National Account Customers," identified as chain or multiple outlets with operations in the Territory and one or more operations outside of the Territory, and that an "invasion fee" was owed only if the National Account Customer was listed in Appendix D to the Agreement.   (Ex. 1, Hedinger Decl. ¶ 15).

16.     Jewel/Osco is a chain store that has multiple outlets with operations both inside the Territory and outside the Territory.  (Ex. 2, Nootbaar Decl. ¶ 8).  However, it is not listed on Appendix D.  (See Ex. 1, Hedinger Decl., Ex. A, Appendix D).

17.     Central Beverage did not agree with Hedinger Brands' interpretation of the Agreement. (Ex. 1, Hedinger Decl. ¶ 17).

18.     Royal Crown Bottling Company of Evansville, Indiana ("RCB") is an approved source for the purchase of DAD'S® branded products by Central Beverage. (Ex. 1, Hedinger Decl. ¶ 18). RCB is not affiliated with Hedinger Brands, nor does Hedinger Brands have an ownership interest in RCB. (Ex. 1, Hedinger Decl. ¶ 19).

19.     On or about October 8, 2007, Central Beverage ordered approximately 22 pallets of DAD'S® branded products from RCB. (Ex. 3, Thompson Decl. ¶ 7). RCB, through an approved trucking company, delivered that product on October 10, 2007. (Exhibit 3, Thompson Decl. ¶ 8). RCB is owed $6,384.50 plus late fees for the product delivered to Central Beverage. (Ex. 3, Thompson Decl. ¶ 9). Central Beverage has refused to pay RCB for the October 10, 2007 shipment of product. (Ex. 3, Thompson Decl. ¶ 10).

20.     RCB is seeking to recover the debt owed to it through a collection agency and will sue Central Beverage if the collection agency efforts are not successful. (Ex. 3, Thompson Decl. ¶ 11).

21.     On October 11, 2007, Donna Spagnola of Central Beverage sent an email to Keith Hedinger and Jim Nootbaar of The Dad's Root Beer Company, LLC noting that they had spoken about Central Beverage's claim that Hedinger Brands had breached the Agreement by selling DAD'S® products to Jewel/Osco. (Ex. 1, Hedinger Decl. ¶ 12 and Ex. B to same). Spagnola followed up with an email on October 23, asking to schedule a "strategy visit to discuss monies owed to Central for direct shipments to Jewel" and stating: "We do have an open invoice for a recent load [of product from RCB] which I will wait to process until I know what deductions should be made for amounts owed to us." (Ex. 1, Hedinger Decl. ¶ 22 and Exhibit C to same).

22.    On November 21, 2007, Hedinger Brands terminated the relationship between Hedinger Brands and Central Beverage based, in part, on Central Beverage's failure and refusal to pay the amounts owed to RCB. (Ex. 1, Hedinger Decl. ¶ 23).

23.    In its Complaint, Central Beverage contends that its termination by Hedinger Brands was "not for cause." (Complaint, ¶ 12). As a result, it seeks damages under Paragraph 7.3 of the Agreement. (Complaint, ¶¶ 13, 14). In addition, Central Beverage seeks damages for "Direct Sales" made by Hedinger Brands that were purportedly made in violation of the exclusive rights granted to Central Beverage under the Agreement. (Complaint, ¶¶ 9-10).

D.    Facts Supporting Venue and Jurisdiction.

24.    Jurisdiction in the Court is proper pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship between Central Beverage and Hedinger Brands, and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Complaint, ¶¶2-3, 10, 14)

25.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the underlying actions took place in Illinois. (Complaint, ¶¶1-2, 5, 6, 9).

WHEREFORE, Hedinger Brands prays that the Court grant its Motion for Summary Judgment, dismiss Central Beverage's Complaint with prejudice, and award Hedinger Brands all other appropriate relief.

Dated: July 10, 2008                    **BARNES & THORNBURG LLP**


By: /s/ Jonathan P. Froemel
**DWIGHT D. LUECK**
11 S. Meridian Street
Indianapolis, IN 46204-3506
Telephone: (317) 231-1313
Facsimile: (317) 231-7433
[Pro hac vice]

**JONATHAN P. FROEMEL**
**JAMES E. MICHEL**
One North Wacker Drive, Suite 4400
Chicago, IL 60606
Telephone: (312) 357-1313
Facsimile: (312) 759-5646

Attorneys for Defendant,
**HEDINGER BRANDS, LLC**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the foregoing **Hedinger Brands'**

**Local Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for**

**Summary Judgment** was served via the Court's electronic filing system this 10th day of July,

2008, on the following counsel:

> Richard A. Del Giudice, Esq.
> Earl E. Farkas, Esq.
> David N. Pruitt, Esq.
> GOZDECKI & DEL GIUDICE, LLP
> 221 North LaSalle Street
> Suite 2200
> Chicago, IL  60601


/s/ James E. Michel

CHDS01 473344v1

# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMADO, INC., d/b/a CENTRAL BEVERAGE COMPANY, an Illinois corporation, | ) ) ) | |
| | ) | Case No. 08 C 1146 |
| Plaintiff, | ) ) | Judge Dow |
| v. | ) ) | Magistrate Judge Ashman |
| HEDINGER BRANDS, LLC, an Indiana limited liability company, | ) ) ) | |
| Defendant. | ) | |

## DECLARATION OF KEITH G. HEDINGER

I, Keith G. Hedinger, declare and state as follows:

1.     I am over the age of 18 and suffer no disability which would prevent me from testifying truthfully.

2.     I am a member of Hedinger Brands, LLC ("Hedinger Brands"). I have been a member of Hedinger Brands since its creation in January 2007. Based on my involvement in Hedinger Brands, I have first hand knowledge of the facts set forth in this Affidavit.

3.     DAD'S® root beer has been sold in the United States for 71 years, since 1937.

4.     On January 12, 2007, Hedinger Brands acquired the proprietary formulae, trademark and distribution rights in DAD'S® root beer from The Monarch Beverage Company, Inc. ("Monarch"). Hedinger Brands has licensed The Dad's Root Beer Company, LLC to sell and market DAD'S® root beer products.

5.    At the time of the acquisition, Monarch distributed the DAD'S® product through several distributors, including Pamado, Inc., d/b/a Central Beverage Company ("Central Beverage").

6.    Central Beverage is a beverage distributor in the Chicago area.

7.    On or about February 6, 2006, Monarch and Central Beverage executed a Trademark License and Distributor's Agreement (the "Agreement") that authorized Central Beverage to distribute Monarch products, including those bearing the MOXIE ENERGY™, ALLSPORT™ and DAD'S® trademarks under terms and conditions defined by the Agreement. A true and correct copy of that Agreement is attached as Exhibit A to this Affidavit.

8.    That portion of the Agreement relating to distribution of DAD'S® products was assigned by Monarch to Hedinger Brands on January 12, 2007.

9.    Hedinger Brands did not acquire rights in the MOXIE ENERGY™ or ALLSPORT™ products.

10.    Appendix D to the Agreement was never amended.

11.    Beginning in the spring of 2007, Central Beverage complained that Hedinger Brands was breaching the Agreement by allowing DAD'S® branded products to be sold to Jewel/Osco stores located in Central Beverage's Territory.  These complaints were first raised with James Nootbaar, National Sales Manager for The Dad's Root Beer Company, LLC, by Mark Muench of Central Beverage.

12.    Specifically, Central Beverage contended that any sales to Jewel/Osco in the Territory "should have been through Central or if not, an invasion fee is owed to Central."  This contention was raised with Mr. Nootbaar in the spring of 2007 and was raised again in an email

that Ms. Spagnola sent to me on October 11, 2007.  A true and correct copy of that email is attached to this Affidavit as Exhibit B.

13.    Mr. Nootbaar communicated these complaints to me.

14.    Central Beverage raised this issue again when it met Mr. Nootbaar at a trade show on October 1 and 2, 2007.

15.    Hedinger Brands denied these claims because the plain language of Paragraph 1 of the Agreement allowed Hedinger Brands to sell Beverages to "National Account Customers," identified as chain or multiple outlets with operations in the Territory and one or more operations outside of the Territory, and that an "invasion fee" was owed only if the National Account Customer was listed in Appendix D to the Agreement.

16.    Jewel/Osco is a chain store that has multiple outlets with operations both inside the Territory and outside the Territory.  However, it is not listed on Appendix D to the Agreement.

17.    Central Beverage did not agree with Hedinger Brands' interpretation of the Agreement.

18.    Royal Crown Bottling Company of Evansville, Indiana ("RCB") is an approved source for the purchase of DAD'S® branded products by Central Beverage.

19.    RCB is not affiliated with Hedinger Brands, nor does Hedinger Brands have an ownership interest in RCB.

20.    I understand that on or about October 8, 2007, Central Beverage ordered approximately 22 pallets of DAD'S® branded products from RCB.

21.    On October 11, 2007, Ms. Spagnola of Central Beverage sent the email references above and attached as Exhibit B to this Affidavit.

22.   Ms. Spagnola followed up with an email on October 23, 2007, asking to schedule a "strategy visit to discuss monies owed to Central for direct shipments to Jewel" and stating: "We do have an open invoice for a recent load [of product from RCB] which I will wait to process until I know what deductions should be made for amounts owed to us."  A true and correct copy of that email is attached as Exhibit C to this Affidavit.

23.   On November 21, 2007, Hedinger Brands terminated the relationship between Hedinger Brands and Central Beverage based, in part, on Central Beverage's failure and refusal to pay the amounts owed to RCB.

24.   The pending litigation followed.

25.   A true and correct copy of Central Beverage's Rule 26(a)(1) Disclosure Statement is attached as Exhibit D to this Affidavit.

I declare under penalty of perjury that the foregoing is true and correct.

Keith G. Hedinger

INDS02 DDL 984737v1

4

# Exhibit A

THE MONARCH BEVERAGE COMPANY, INC.
TRADEMARK LICENSE AND
DISTRIBUTOR'S AGREEMENT

THIS AGREEMENT made and entered into this 6ᵗʰ day of February, 2006, by and between THE MONARCH BEVERAGE COMPANY, INC., a corporation organized and existing under the laws of the state of Delaware (hereinafter referred to as "Company"), as party of the first part, and Central Beverage Company, a corporation organized and existing under the laws of the state of Illinois, (hereinafter referred to as "Distributor"), as party of the second part.

WITNESSETH

WHEREAS, Company is the owner of the proprietary formulae essential for the manufacture of various soft drink concentrates syrups and beverages, and Company is the owner of Trademark(s) identified in Appendix "A" (hereinafter referred to as the "Trademark(s)") which are used in identifying and marketing such concentrates, syrups and beverages, and

WHEREAS, the Distributor desires to acquire from Company a license to use the Trademarks, and the right to sell and distribute certain beverages under the trademarks, within a defined and limited territory; and

WHEREAS, Company is willing to grant to the Distributor a license to use the Trademark(s), to authorize the Distributor to sell and distribute such beverages within a defined and limited territory, and has agreed to grant the Distributor, the right to use the Trademark(s) in connection with the sale and distribution of such beverages within such territory; and

WHEREAS, the Distributor declares that Company is the sole owner of the proprietary formulae and the Trademarks, that Distributor acquires no right of ownership of the proprietary formulae or the Trademarks by virtue of anything contained or implied by this Agreement, and that Distributor will not at any time contest Company's sole ownership and right to control the proprietary formulae or the Trademarks.

NOW THEREFORE, in consideration of the premises, which are incorporated and made a part of this agreement and of the mutual covenants contained herein, the parties hereto mutually agree as follows:

GRANT OF RIGHT

1.0     Company hereby grants the exclusive right, except as set forth below to Distributor, to distribute and sell only in the restricted territory, defined and described in Appendix "C" (the "Territory"), only the package sizes listed in Appendix "B", and only the beverages listed in Appendix "A" (hereinafter referred to as the "Beverages").

        (a)     The Distributor's right to sell and distribute Beverages in the Territory shall be exclusive except that the Company reserves the right to sell Beverages to chain or multiple outlets with operations in the Territory and one or more operations outside the Territory (hereinafter called the "National Account Customers") for an invasion fee of $1.00 per case for the accounts listed in Appendix D.

1.1     Except as set forth above, during the term of this Agreement, Company shall not grant the right to any other person, firm or corporation to sell and distribute the Beverages in the packaging specified above in the Territory; provided that Company shall not be bound by the provisions of this Paragraph 1.1



EXHIBIT
A

1

from the date on which Company receives written notice of termination of this Agreement from the Distributor as hereinafter provided.

1.2    This Agreement shall not be construed as affecting or impairing the right of Company to produce, sell and distribute, or cause to be produced, sold and distributed, concentrates, syrups and beverages in any form or manner, other than the Beverages in the packaging specified above in the Territory.

1.3    The privilege of the Distributor to sell and distribute the Beverages is limited to the Territory; and the Distributor may not sell or distribute the Beverages to any person for resale beyond the limits of the Territory without the written consent of Company first obtained.

1.4    The initial term of this Agreement is for three years, ~~which can be extended for a duration to be determined by mutual agreement of both parties.~~ *which shall be automatically extended for successive three year periods subject to the termination provisions under section 7.*

## GRANT OF TRADEMARK LICENSE

2.0    Company hereby grants to Distributor a License, but without the right to grant sublicenses, to use the Trademark(s) in connection with the sale and distribution within the Territory of the Beverages. When necessary and appropriate, Company agrees that Distributor may be registered as the registered user of the Trademark(s) for the Beverages within the Territory; and Distributor shall execute such documents and other papers and take such other action as may be deemed necessary or desirable by Company in order to effect such registration of Distributor as a registered user in the Territory. The License granted hereby shall immediately cease upon the termination of this Agreement pursuant to any of the provisions contained in this Agreement.

2.1    It is distinctly understood by both Distributor and Company that nothing contained herein shall in any way be deemed to convey, transfer, or assign to the Distributor any proprietary rights in or to the Trademark(s) licensed hereunder and that, to the contrary, the Trademark(s) shall at all times remain the property of Company. All costs and expenses relating to the obtaining or maintaining of any registration of the Trademark(s) in this Territory shall be borne by Company. In using the Trademark(s) under this Agreement, Distributor at all times shall recognize the ownership of said Trademark(s) by Company and the validity of said Trademark(s) and the registration thereof, and Distributor shall not at any time attack or put in issue, directly or indirectly, such validity or ownership.

2.2    Company reserves the complete and exclusive right to take whatever action it deems necessary or desirable in order to protect the Trademark(s) in the Territory, and Distributor agrees that Company shall have said complete and exclusive right. In the event that any infringement or threatened infringement of the Trademark(s) by any third party in the Territory shall come to the attention of Distributor, Distributor shall promptly notify, Company thereof, and Company in its sole discretion shall decide what action, if any, is to be taken with respect to such infringement or threatened infringement.

2.3    Distributor shall apply the Trademark(s) to all bottles, cartons, and other containers of the Beverages used, sold and distributed by Distributor under this Agreement, and in general shall conform to the requirements and instructions of Company with respect to the manner and use of the Trademark(s) in connection with the Beverages, in advertising materials and otherwise. Distributor shall use and apply to the Beverage labels, containers and cartons only those graphics and designs supplied to Distributor by Company. Distributor shall provide Company with copies of all labels used in connection with the Beverages.

2.4    If this Agreement is terminated at any time for any reason, Distributor shall as of the date of termination discontinue using the Trademark(s) and forever thereafter refrain (or cause those within its control to refrain, as the case may be) from using the Trademark(s) including any non-generic component thereof or any mark or words similar thereto in any trademark or trade name or in its name or in the name of

any corporation, firm, sole proprietorship or other organization of business owned, controlled or operated by Distributor. Distributor agrees that upon such termination of this Agreement it shall forthwith take or cause to be taken any and all action that Company may deem necessary on Distributor's part in order to terminate any registration of Distributor as a registered user of the Trademark(s).

    2.5    Distributor shall not use the Trademark(s) in any way in connection with the production, use, sale, or distribution of any products other than the Beverages covered by this Agreement. Distributor agrees that it will comply with all applicable statutory requirements regarding trademark marking used in connection with the Beverages. Distributor also agrees that it will not use the Trademark(s) in any way which would tend to cause them to become generic names.

## PURCHASE OF BEVERAGES

    3.0    The Distributor agrees to purchase from Company approved sources all of the Beverages required to supply fully every demand for the Beverages within the Territory.

## QUALITY CONTROL

    4.0    For the purpose of assuring sale of the Beverages of the highest standards and quality, the Distributor shall purchase the Beverages exclusively from Company approved sources. The Distributor shall use only such types of containers and packaging materials as are from time to time approved by Company.

    4.1    Representatives of Company shall have access to the Distributor's facilities for the purpose of inspecting and determining whether the Beverages are rotated, maintained and handled according to standards and requirements of the Company and the Distributor at the request of Company shall provide without cost to Company's designated research facility in the United States samples of the Beverages and any and all packaging materials used by the Distributor hereunder.

## DUTIES OF DISTRIBUTOR

    5.0    The Distributor shall use, publish, maintain and/or distribute only such advertising of the Beverages as Company shall approve and authorize.

    5.1    Each month the Distributor shall provide a written report to Company indicating the number of cases of the Beverages sold and distributed by the Distributor during the preceding month on forms supplied by Company for such purpose. Company may audit Distributor's records periodically for the purpose of verifying the accuracy of the number of cases sold, distributed and reported by Distributor.

    5.2    The Distributor shall use its best efforts to promote, develop and service the market for the Beverages throughout the Territory and shall maintain and operate warehouses or other facilities, trucks, and other equipment as are adequate to meet all requirements for the sale and distribution of the Beverages within the Territory. The Distributor shall by prompt delivery, adequate service to customers, and otherwise, build and maintain a reasonable volume of patronage, no less than the minim requirements defined in 7.2 (b) for the Beverages throughout the Territory and will cooperate with Company in its plans for maintenance and expansion of the sale of the Beverages in the Territory.

    5.3    Distributor will operate and maintain a clean and sanitary storage facility and will comply with all the requirements of Company, or of persons authorized by it, and of the relevant governmental authorities and local laws and regulations to guarantee the Beverages to be pure wholesome and of the highest quality.

3

5.4     The Distributor agrees to:

(a)     Maintain a well-trained sales force, adequate to service all customers within the Territory;

(b)     Keep said sales force fully informed as to Company's policies and adequately train said sales force to promote the sale of the Beverages in a manner which shall reflect favorably on Distributor and Company;

(c)     At all times to cooperate with Company in performing promotions and marketing programs mutually agreed upon within the Territory;

(d)     Afford representatives of Company reasonable opportunity to meet with and help train Distributor's sales force and merchandising personnel;

(e)     Maintain inventories of the Beverages which the parties mutually agree will be adequate to meet demand for Beverages in the Territory;

(f)     Promote the sale of the Beverages within the Territory in an aggressive and diligent manner;

(g)     Maintain prompt delivery service compatible with good business practice, the nature of the Beverages and the requirements of its customers; and

(h)     Acknowledges that Company is the owner all right, title and interest to the proprietary formulae necessary for the Beverages, soft drink concentrate, syrups and other materials supplied by Company or its designated suppliers to Distributor for use in Territory and Distributor undertakes and agrees not to reverse engineer any of the Beverages, soft drink concentrate, syrups and other materials or other materials to ascertain the formulae and shall not conduct any tests on the [Licensed Products] or the ingredients thereof. [Optional]

## NAME OF BUSINESS

6.0     The business of the Distributor shall be conducted under the name <u>Central Beverage Company</u> or another name which shall be mutually acceptable to Company and the Distributor.

6.1     Should the Distributor be authorized to use the Trademark(s) or any non-generic component thereof in any form of business organization or enterprise name, the Distributor shall immediately upon termination of this Agreement change such name and any registration thereof to exclude same and cease using all materials containing any usage thereof, including letterheads and business forms.

## TERMINATION

7.0     Company shall be entitled to terminate this Agreement forthwith, in the event of the Distributor becoming insolvent or bankrupt or subject to the provisions of any winding up or bankruptcy legislation, or going into liquidation, either voluntarily or under an order of a court of competent jurisdiction, or making a general assignment for the benefit of its creditors, or being placed in the hands of a receiver, or otherwise acknowledging its insolvency; or becomes unable to pay the debts when due.

 4

7.1     The Distributor agrees to adhere to ethical business practices and high standards of business operation. The rights set forth herein are granted to Distributor because of and in reliance on Distributor's present ownership and ability to control management and any change in ownership or ownership control over fifty percent (50%) of the business shall constitute a reason for cancellation or termination of this Agreement by Company unless such change has been previously approved in writing by Company. *Such approval to not be unreasonably withheld* NJ

7.2     This contract may be terminated for material breach of any obligation, representation, warranty, or covenant in this Agreement, as well as for the following reasons and in the following manner:

    (a)     By the mutual written termination of the parties; *to make no best efforts*

    (b)     By the Company if the Distributor fails to meet the minimum sales each year defined as 12,000 raw cases in 2006, 14,000 raw cases in 2007 and 16,000 raw cases in 2008.

    (c)     Notwithstanding anything to the contrary herein, in the event the Distributor shall discontinue its operations or fail to distribute or sell the Beverages for a period of fifteen (15) days, the Distributor shall be deemed to have abandoned its rights under this Agreement and Company shall have the option to cancel this Agreement on fifteen (15) days' written notice;

    (d)     Failure of the Distributor to pay to the Company approved source the price or prices of the Beverages.

## MISCELLANEOUS

*→ See next 7.3* *Such consent to not be unreasonably withheld* NJ

8.0     This Agreement is of a personal nature and may not be assigned, transferred, conveyed, or pledged by the Distributor directly or indirectly by operation of law or otherwise without the written consent of Company first obtained. In the event of assignment with such written consent, the assignee of assignees of the Agreement through such assignment shall be known as "Distributor" under the terms of this Agreement, and all the provisions hereof shall accrue to and be binding upon such assignee or assignees.  This Agreement is fully and freely assignable by Company without the consent of Distributor.

8.1     If any part of this Agreement is not, or ceases to be, in conformity with the laws of the jurisdiction in which the Territory is located, and as a result thereof any one of the essential stipulations herein cannot be legally performed, then Company or the Distributor shall have the right to terminate this Agreement or the parties may agree to modify this Agreement to conform with said laws of the jurisdiction.

8.2     The failure by Company to enforce at any time or for any period of time any one or more of the terms or conditions of this Agreement shall not constitute a waiver of such terms or conditions or of Company's right thereafter to enforce each and every term and condition of this Agreement.

8.3     Neither party to this Agreement shall be held responsible for failure to perform any obligation imposed hereunder, where such failure is caused by Act of God, war strike, or other cause whatsoever beyond the control of such party. *Or other means available under the laws of the State of Illinois*

8.4     The Distributor and Company agree that all disputes arising under or relating to this Agreement, if not otherwise resolved by mutual agreement of the parties, shall be settled by arbitration One or more arbitrators appointed in accordance with the Rules shall conduct such arbitration in accordance with the Commercial Arbitration Rules of The North American Arbitration Association. Judgment upon any award rendered may be entered in any court having jurisdiction over the award or over either of the parties to

NJs

MONARCH BEVERAGE COMPANY
AGREEMENT WITH CENTRAL BEVERAGE COMPANY
DATED FEBRUARY 6, 2006

INSERT

7.3. The Company may terminate this Agreement for any other reason than those listed in sections 7.0, 7.1 or 7.2 or for no reason at all, upon 90 days' written notice to the Distributor, or by virtue of non-renewal under section 1.4. Such termination will be effective as of the expiration of such 90 day period. In lieu of any other claim Distributor may have with respect to such termination by the Company, Distributor shall be entitled to receive compensation for each case sold by Distributor during the twelve month period ending on the date termination of this Agreement becomes effective. In the event this Agreement has been in effect for less than 12 months, the cases sold for purposes of compensation will be annualized. This per case compensation shall be a minimum two times per case gross margin.   In the event this Agreement is terminated within 12 months of the sale or assignment of the Company's rights under this Agreement, this amount shall be doubled. The payment of such compensation shall be deemed to be in full and complete satisfaction of all claims and causes of action Distributor may have relating in any way to the termination hereof.



this Agreement, or application may be made to such court for a judicial acceptance of such award and an order of enforcement, as the case may be. Any such arbitration proceedings shall be conducted in the English language in ~~Atlanta, Georgia, United States of America.~~ *The State of Illinois*

    8.5    This Agreement shall be deemed to be a ~~contract~~ made under the laws of the State of Georgia, U.S.A., and for all purposes shall be construed in accordance with said laws.

    8.6    Notices shall be considered effective when faxed or if mailed, certified or registered mail, return receipt requested, postage prepaid, to Company or Distributor at the following addresses on the date noted as the delivery or attempted delivery date:

Company:                                    Distributor:
The Monarch Beverage Company, Inc.          Central Beverage Company
The Monarch Tower -- Suite 1450             2601 South 25th Ave.
3424 Peachtree Road, NE                     Broadview, Illinois 60155
Atlanta, Georgia 30326                      Attention: Mark T. Muench, CEO
Attention: Jacques Bombal                   Phone: 708-344-6602
Fax: 404-262-4001

    8.7    This instrument, including all of the attached Appendices and Exhibits, sets forth the entire Agreement between the parties, superseding any other agreement to the purchase, sale and distribution of the Beverages by the Distributor and any waiver, alteration or modification of this Agreement shall not be binding unless the same shall be in writing and signed by a duly authorized officer of the Distributor and by a duly authorized officer of Company.

    IN WITNESS WHEREOF, the parties hereto, respectively, have caused the Agreement to be executed and sealed on their behalf by their duly authorized representatives effective as of the date herein above first written.

| THE MONARCH BEVERAGE COMPANY, INC. (Company) | Central Beverage Company (Distributor) |
|---|---|
| By: Jacques Bombal | By: |
| Title: CEO | Title: |

6

**APPENDIX A**
**TRADEMARKS**

**Rush! Energy** ™
**Rush! Energy Lite** ™

**Moxie Energy** ™

ALL SPORT - ALL LINES

DADS - ALL LINES & FLAVORS

7

**APPENDIX B**
**PACKAGE SIZES**

**All Packages**



**APPENDIX C**
**TERRITORY**

In the state of Illinois, the counties of: ~SEE ATTACHED

9

SCHEDULE "C"
TERRITORY

Distributor has the exclusive distribution rights in the state of Illinois for the following territory:

CENTRAL TERRITORY

In the State of Illinois

Starting at the junction of Lake Michigan and Belmont Ave.  West on Belmont Ave. to Cicero Ave.  Cicero Ave. south to North Ave.  North Avenue west to Route 45. Route 45 north to Irving Park Road.  Irving Park Road west to Route 59.  Route 59 south to Will/DuPage border.  East on Will/DuPage border to I-355.  South on I-355 to I-55.  East along I-55 to Route 83.  South on Route 83 to Bell Road. South on Bell Road to the Cook/Will County line.  Follow the Cook/Will County line east and south to Steger Road.  East on Steger Road to the Illinois/Indiana state line:  North on the Illinois/Indiana state line to Lake Michigan.  North along the border of Lake Michigan to Belmont Ave., the point of origin.

_____
SUPPLIER

By: JACQVES BOMBATZ

Title: CEO

_____
DISTRIBUTOR

By: DONNA L SPAGNOLA

Title: PRESIDENT

## APPENDIX D
## NATIONAL ACCOUNTS

WALGREEN'S

# Exhibit B

Donna Spagnola

**From:** Donna Spagnola
**Sent:** Thursday, October 11, 2007 2:51 PM
**To:** 'Jim Nootbaar'; 'khedinger@dadsrootbeer.com'
**Subject:** Follow Up

Jim and Keith,

It was good to see you at the NBWA convention and trade show - hope it was a successful trade show for you.

As a follow up to our conversation there and our phone call with Jim earlier this week, it would probably be good for us to meet again and discuss future strategy for the Dad's brands in Chicago.

We also need to discuss monies owed to Central for the direct shipping of Dad's to Jewel via Dahlstrom, now Integrity.  Per the terms of our contract, those deliveries should have been through Central or if not, an invasion fees is owed to Central.  As such, can you please provide sales details of what has been sold to Dahlstrom.

Thanks and we will wait to hear from you.

Donna

# Exhibit C

**Donna Spagnola**

**From:**  Donna Spagnola
**Sent:**  Tuesday, October 23, 2007 5:29 PM
**To:**  'Jim Nootbaar'; 'khedinger@dadsrootbeer.com'
**Subject:** Dad's Follow Up

m and Keith,

ollowing up to my email of two weeks ago.  Please call to schedule a strategy visit and to discuss monies owed to Central for irect shipments to Jewel via Dahlstrom as well as Walgreens.

do have an open invoice for a recent load which I will wait to process until I know what deductions should be made for amounts wed to us.


lonna

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| PAMADO, INC., d/b/a CENTRAL BEVERAGE COMPANY, an Illinois corporation, | ) ) ) ) | Case No.  08-C-1146 |
| | ) | Judge Robert M. Dow, Jr. |
| Plaintiff-Counterdefendant, | ) ) | Magistrate Judge Ashman |
| v. | ) ) | Removed from the Circuit Court of Cook |
| HEDINGER BRANDS, LLC, an Indiana limited liability company | ) ) ) | County, Illinois, Law Division, Case No. 08-L-000646 |
| Defendant-Counterplaintiff. | ) ) | |

**PAMADO, INC. d/b/a CENTRAL
BEVERAGE COMPANY'S
RULE 26(a)(1) DISCLOSURE STATEMENT**

Defendant Pamado, Inc., d/b/a Central Beverage Company ("Central Beverage"), hereby

provides to plaintiff its initial discovery disclosures pursuant to Rule 26(a)(1) of the Federal

Rules of Civil Procedure:

A.  **The name and, if known, the address and telephone number of each
individual likely to have discoverable information – along with the subjects
of that information – that the disclosing party may use to support its claims
or defenses, unless the use would be solely for impeachment:**

**RESPONSE:**

See attachment A.  In addition to the individuals listed on Attachment A, Central

Beverage's investigation of persons with knowledge continues.

B.  **A copy – or a description by category and location – of all documents,
electronically stored information, and tangible things that the disclosing
party has in its possession, custody or control and may use to support its
claims or defenses, unless the use would be solely for impeachment:**

**RESPONSE:**

Central Beverage responds by producing documents Bates numbered 00001 through 000102. The investigation continues with respect to electronically stored information that may be in Central Beverage's possession. Central Beverage anticipates that there may be electronically stored information as to sales data and electronic correspondence.

    C.    **A computation of any category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered:**

**RESPONSE:**

A computation of Central Beverage's damages is set forth in paragraphs 10 through 14 of the Complaint. As a result of the Direct Sales (as defined in the Complaint), Central Beverage claims the profit margin of $2.60 per case of liter products on more than 20,000 cases of product that Defendant sold directly to Jewel/Osco in violation of the Agreement (as defined in the Complaint), resulting in damages of at least $52,000.

Furthermore, as stated in paragraphs 13 and 14 of the Complaint, pursuant to paragraph 7.3 of the Agreement, Defendant is liable to Central Beverage for its termination of the Agreement without cause in the amount of at least $119,000, which represents two times Central Beverage's gross margin on all cases Central Beverage should have sold during the 12 month period preceding the termination if Defendant had not breached the Agreement

Central Beverage's damage calculations may change as more information about lost sales becomes available during discovery. Investigation continues.

    D.    **For inspection and copying as under Rule 34, any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment:**

**RESPONSE:**

Central Beverage is unaware of any applicable insurance coverage.  Investigation

continues.

Respectfully submitted,

Pamado, Inc., d/b/a Central Beverage
Company

BY: _____
One of its Attorneys

Richard A. Del Giudice, Esq.
Earl E. Farkas, Esq.
**GOZDECKI & DEL GIUDICE**
221 North LaSalle Street
Suite 2200
Chicago, IL  60601
(312) 782-5010

## AFFIDAVIT OF SERVICE

I, Donna Murphy, hereby state under oath that I caused copies of the attached **Pamado,**

**Inc. d/b/a Central Beverage Company's Rule 26(a)(1) Disclosure Statement** to be be

deposited in the United States Post Office Box at 221 North LaSalle Street, Chicago, IL 60601

on this 7th day of May, 2008 addressed to:

> Jonathan P. Fromel, Esq.
> Dwight D. Lueck, Esq.
> James E. Michel, Esq.
> Barnes & Thornburg, LLP
> One North Wacker Drive
> Suite 4400
> Chicago, IL  60606

SUBSCRIBED AND SWORN
to before me this 7th day of
May, 2007

"OFFICIAL SEAL"
SANDY GODINEZ
Notary Public, State of Illinois
My Commission Expires Aug. 3, 2008

4

# Exhibit 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMADO, INC., d/b/a CENTRAL | ) | |
| BEVERAGE COMPANY, | ) | |
| an Illinois corporation, | ) | |
| | ) | Case No. 08 C 1146 |
| Plaintiff, | ) | |
| | ) | Judge Dow |
| v. | ) | |
| | ) | Magistrate Judge Ashman |
| HEDINGER BRANDS, LLC, | ) | |
| an Indiana limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF JAMES NOOTBAAR

I, James Nootbaar, declare and state as follows:

1.     I am over the age of 18 and suffer no disability which would prevent me from testifying truthfully.

2.     I am National Sales Manager for The Dad's Root Beer Company. I have held that position since February 19, 2007. Before being employed in that position I was the National Sales Manager for The Monarch Beverage Company, Inc. ("Monarch"). Among the accounts assigned to me while I worked for Monarch was that of Pamado, Inc., d/b/a Central Beverage Company ("Central Beverage"). Based on my involvement in these jobs, I have first hand knowledge of the facts set forth in this Affidavit.

3.     Hedinger Brands, LLC ("Hedinger Brands") acquired the rights to distribute root beer under the DAD'S® trademark from Monarch in January 2007. At the time of the acquisition, Monarch distributed the DAD'S® product through several distributors, including Central Beverage.

4.     Central Beverage is a beverage distributor in the Chicago area.

5.     Central Beverage distributes a variety of brands, including Old Style, Pabst Blue Ribbon, Colt 45, Arizona Teas and LaCroix water.

6.     Beginning in the spring of 2007, Central Beverage complained that Hedinger Brands was breaching the Agreement by allowing DAD'S® branded products to be sold to Jewel/Osco stores located in Central Beverage's Territory. Mark Muench of Central Beverage, made these complaints to me. I then shared the complaints with Keith Hedinger.

7.     Central Beverage raised this issue again when Donna Spagnola, President and CFO of Central Beverage, met me at a trade show on October 1 and 2, 2007.

8.     Jewel/Osco is a chain store that has multiple outlets with operations both inside the Territory and outside the Territory. However, it is not listed on Appendix D to the Agreement.

I declare under penalty of perjury that the foregoing is true and correct.


_____
James Nootbaar

INDS02 DDL 984739v1

2

# Exhibit 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAMADO, INC., d/b/a CENTRAL )
BEVERAGE COMPANY, )
an Illinois corporation, )
            )    Case No. 08 C 1146
          Plaintiff, )
            )    Judge Dow
    v. )
            )    Magistrate Judge Ashman
HEDINGER BRANDS, LLC, )
an Indiana limited liability company, )
            )
          Defendant. )

## DECLARATION OF DEREK THOMPSON

I, Derek Thompson, declare and state as follows:

1.     I am over the age of 18 and suffer no disability which would prevent me from testifying truthfully.

2.     I am the Controller of Royal Crown Bottling Company of Evansville, Indiana ("RCB"). I have personal knowledge of the facts contained in this Declaration based on my position and my work for RCB.

3.     RCB is an approved source for the purchase of DAD'S® branded products by distributors such as the defendant in this case, Pamado Inc. d/b/a Central Beverage Company ("Central Beverage").

4.     As an approved source, RCB has been provided by Hedinger Brands, LLC ("Hedinger Brands"), subject to obligations of confidentiality, with trade secrets relating to the manufacture of DAD'S® branded products. RCB is authorized to sell those products to approved distributors.

5.      RCB is not affiliated with Hedinger Brands, nor does Hedinger Brands have an ownership interest in RCB.

6.      I understand that in October 2007, Central Beverage was a distributor of DAD'S® branded products in the Chicago area.

7.      On or about October 8, 2007, Central Beverage ordered approximately 22 pallets of DAD'S® branded products from RCB.

8.      RCB, through an approved truck line, delivered that product on October 10, 2007.

9.      RCB is owed $6,384.50 plus late fees for the product delivered to Central Beverage.

10.     Central Beverage has refused to pay RCB for the October 10, 2007 shipment of product.

11.     RCB is presently seeking the monies owed to it by Central Beverage through a collections agency. If that is not successful RCB expects that it will sue Central Beverage to recover the amounts owed to RCB.

I declare under penalty of perjury that the foregoing is true and correct.

Derek Thompson

INDS02 DDL 984740v1

2