**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAMADO, INC., d/b/a CENTRAL | ) | |
| BEVERAGE COMPANY, | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Plaintiff-Counterdefendant, | ) | 08-cv-1146 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| HEDINGER BRANDS, LLC, | ) | |
| an Indiana limited liability company, | ) | |
| | ) | |
| Defendant-Counterplaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

This lawsuit arises out of a trademark license and distributor's agreement between Pamado, Inc., d/b/a Central Beverage Company ("Central Beverage") and Hedinger Brands, LLC ("Hedinger") for the distribution of DAD'S® root beer. Before the Court are cross motions for partial summary judgment. Central Beverage's motion [58] asks the Court to find Hedinger liable on all aspects of its complaint and to find that Central Beverage is entitled to damages in an amount to be proven at trial. Conversely, Hedinger seeks summary judgment in its favor on Central Beverage's complaint [53]. For the following reasons, both parties' motions [53, 58] are granted in part and denied in part.

**I.      Background**

The facts relevant to the disposition of the instant motion are straightforward and largely not in dispute.[1] Central Beverage distributes alcoholic and non-alcoholic beverages throughout

---

[1] The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements. L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385

the Chicago area.  On or about February 6, 2006, Central Beverage entered into a Trademark

License and Distributor's Agreement (the "Agreement") with a company called Monarch

Beverage Company.  At that time, Monarch owned the proprietary formulae, trademark, and

distribution rights in DAD'S® root beer.  The Agreement designated Central Beverage as the

exclusive distributor of certain beverages (including all DAD'S® products) within a designated

sales territory in the Chicago area, subject to the exception discussed below.  On January 12,

2007, Monarch sold its rights in DAD'S® products to Hedinger.  Hedinger thus became the

assignee of the Agreement between Monarch and Central Beverage as it related to distribution of

DAD'S® products.[2]

Section 1.0 of the Agreement ("Grant of Right") is the provision that granted Central

Beverage the exclusive right to distribute DAD'S® products within its sales territory.  The

provision reads:

> 1.0     Company grants the exclusive right, except as set forth below to
> Distributor, to distribute and sell only in the restricted territory, defined and
> described in Appendix "C" (the "Territory"), only the package sizes listed in
> Appendix "B", and only the beverages listed in Appendix "A" (hereinafter

---

F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).  Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement.  See, *e.g.*, *Malec*, 191 F.R.D. at 583.  Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted.  See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584.  The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts.  See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317).  Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact.  See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

[2] Initially, Hedinger took the position that the Agreement had not been assigned to it and that it was not bound to the Agreement.  See *infra* n.7.

referred to as the "Beverages").

> (a)     The Distributor's right to sell and distribute Beverages in the Territory shall be exclusive except that the Company reserves the right to sell Beverages to chain or multiple outlets with operations in the Territory and one or more operations outside the Territory (hereinafter called the "National Account Customers") for an invasion fee of $1.00 per case for the accounts listed in Appendix D.

Appendix A lists a number of products, including "Dad's—All lines & Flavors." Appendix B provides: "All Packages." Appendix C describes Central Beverage's territory, which was a portion of Illinois that included the southern part of Chicago. Appendix D lists only one National Account Customer—Walgreens.

Section 7 of the Agreement sets forth the circumstances under which the Agreement could be terminated. Section 7.0 provides that Hedinger could terminate the Agreement in the event that Central Beverage became insolvent. Section 7.1 provides that Hedinger could terminate the Agreement if Central Beverage experienced a change in ownership or ownership control. Section 7.2 provides as follows:

> 7.2     This contract may be terminated for material breach of any obligation, representation, warranty, or covenant in this Agreement, as well as for the following reasons an in the following manner:

> (a)     By the mutual written consent of the parties;

> (b)     By the Company if the Distributor fails to make its best efforts to meet the minimum sales each year defined as 12,000 raw cases in 2006, 14,000 raw cases in 2007 and 16,000 raw cases in 2008.

> (c)     Notwithstanding anything to the contrary herein, in the event the Distributor shall discontinue its operations or fail to distribute or sell the Beverages for a period of fifteen (15) days, the Distributor shall be deemed to have abandoned its rights under this Agreement and Company shall have the option to cancel this Agreement on fifteen (15) days' written notice;

> (d)     Failure of the Distributor to pay the Company approved source the

price or prices of the Beverages.[3]

Section 7.3 provides as follows:

> 7.3   The Company may terminate this Agreement for any other reason than those listed in sections 7.0, 7.1, or 7.2 or for no reason at all, upon 90 days' written notice to the Distributor, or by virtue of non-renewal under section 1.4. Such termination will be effective as of the expiration of such 90 day period. In lieu of any other claim Distributor may have with respect to such termination by the Company, Distributor shall be entitled to receive compensation for each case sold by Distributor during the twelve month period ending on the date termination of this Agreement becomes effective. In the event this Agreement has been in effect for less than 12 months, the cases sold for purposes of compensation will be annualized. This per case compensation shall be a minimum of one times per case gross margin. In the event this Agreement is terminated within 12 months of the sale or assignment of the Company's rights under this Agreement, this amount shall be doubled. The payment of such compensation shall be deemed to be in full and complete satisfaction of all claims and causes of action Distributor may have relating in any way to the termination thereof.

In February 2007, Hedinger sold 2,265 cases of DAD'S® products to a company called Dahlstrom Distributing ("Dahlstrom"), for a total invoice price of $20,385. Dahlstrom then sold some of those cases to Jewel/Osco retail locations within Central Beverage's exclusive territory. Between May and September of 2007, Hedinger sold 32,275 cases of DAD'S® products to a company called Integrity Distribution ("Integrity") for a total invoice price of $290,475.[4] Integrity then sold some of those cases to Jewel/Osco locations within Central Beverage's territory. Both Dalhstrom and Integrity are beverage distributors that are located and operate in

---

[3] The Agreement, at Section 3.0, provided that the Distributor agrees to purchase all of the Beverages from "Company approved sources."

[4] In its L.R. 56.1 statements, Hedinger clarifies that The Dad's Root Beer Company, LLC actually sold the DAD'S® products to Dalhstrom and Integrity. The Dad's Root Beer Company, LLC is a company authorized and licensed by Hedinger Brands to produce, market, and sell DAD'S® root beer products. In its briefs, Hedinger does not rely on the legal distinction between itself and The Dad's Root Beer Company, LLC for any reason. In fact, Hedinger discusses the sales as if it made them. (See, *e.g.* Hedinger Mem. [54] at 7 ("There is no dispute that Paragraph 1.0 allows Hedinger Brands to make sales to National Account Customers in the Territory * * *"). Accordingly, and for the sake of clarity and simplicity, the Court will discuss the sales to Dalhstrom and Integrity as if Hedinger itself had made them.

Central Beverage's territory and are direct competitors of Central Beverage. Hedinger did not make any direct sales of DAD'S® products to Jewel/Osco in Central Beverage's territory—all of its sales of those products were made through either Integrity or Dalhstrom.

In the spring of 2007, Central Beverage began to complain that Hedinger was breaching the Agreement by allowing DAD'S® products to be sold to Jewel/Osco stores located in Central Beverage's territory. The parties do not dispute that Jewel/Osco is a chain store that has multiple outlets with operations both inside and outside of Central Beverage's territory, and accordingly meets the definition of a "National Account Customer" under Section 1.0(a) of the Agreement.[5] However, Jewel/Osco is not listed on Appendix D to the Agreement. Further, the parties do not dispute that Integrity and Dalhstrom do not meet the definition of a "National Account Customer" under the Agreement. Neither Integrity or Dalhstrom is owed by Jewel/Osco—they are both separate and independent companies from Jewel/Osco.

On or about October 8, 2007, Central Beverage ordered approximately 22 pallets of DAD'S® products from Royal Crown Bottling Company of Evansville, Indiana ("RCB"), an "approved source" for the purchase of DAD'S® products under the Agreement. RCB delivered the product on October 10, 2007, but Central Beverage refused to pay for the shipment.[6]

On October 31, 2007, Ms. Spagnola responded to an e-mail to Mr. Hedinger regarding Hedinger's sales to Jewel/Osco, among other issues. Ms. Spagnola indicated that it was Central Beverage's position that "the agreement remains in full force" notwithstanding Hedinger's ongoing breach of the agreement.

---

[5] Further, the parties do not dispute that there are many stores that satisfy the definition of "National Account Customer" within Central Beverage's sales territory, including Sam's Club, Kmart, Costco, and Wal-Mart.

[6] Ultimately, Hedinger paid RCB for the shipment pursuant to a guaranty agreement between those companies.

On November 21, 2007, Hedinger terminated the Agreement between the parties. Hedinger claims that the termination was based, in part, on Central Beverage's failure and refusal to pay the $6,384.50 (plus late fees) owed to RCB.[7]

As discussed below, there is some dispute about whether Central Beverage could have sold DAD'S® products to Jewel/Osco during the relevant time period. Central Beverage made no attempts to sell DAD'S® products to Jewel/Osco while Central Beverage was a distributor of those products. Keith Hedinger (Hedinger's owner) testified in his deposition that Dalhstrom (whose business was later taken over by Integrity) was the "sole supplier" of nonalcoholic drinks to Jewel/Osco during the relevant time period and that the "only way to get into" Jewel/Osco was through Dahlstrom. (Hedinger Dep. at 126-127). Donna Spagnola, Central Beverage's president, admitted that during the time that Central Beverage was distributing DAD'S® products, Jewel/Osco was "directing [beverage companies] to Dahlstrom or Integrity" and telling them "[i]f you want to get your product into our store * * * [y]ou have to use Dalhstrom or you have to use Integrity." (Spangnola Dep. at 64:16-24). However, Spangola testified that some companies—such as Monster Energy drinks, LaCroix, and Everfresh—refused to transfer their business from Central Beverage to Dalhstrom or Integrity. Instead, these companies continued to use Central Beverage to distribute their products to Jewel/Osco. (*Id*. at 71:20-72:18). In addition to distributing Monster Energy drinks, LaCroix, and Everfresh brand products to Jewel/Osco during the relevant time period, Central Beverage sold (and continues to sell)

---

[7] For its part, Central Beverage contends that the real reason why Hedinger terminated the Agreement was Central Beverage's refusal to execute a new agreement proposed by Hedinger. After Hedinger bought the rights in DAD'S® products from Monarch, Hedinger initially took the position that it was not bound to Monarch's agreement with Central Agreement, and proposed a new agreement under which Central Beverage would distribute DAD'S® products. The new agreement proposed by Hedinger was similar to the Agreement, except it redefined "national account" and did not contain a provision requiring Hedinger to pay to Central Beverage any "invasion fee."

alcoholic beverages directly to Jewel/Osco.

Central Beverage filed its complaint in the Circuit Court of Cook County, Law Division, on January 18, 2008. Hedinger removed the case on February 25, 2008, on the basis of the Court's diversity jurisdiction, 28 U.S.C. § 1441(a) [1]. In its complaint, Central Beverage alleges that Hedinger breached the Agreement in two ways: (1) by allowing DAD'S® products to be sold to Jewel/Osco stores in Central Beverage's exclusive territory, and (2) by failing to pay Central Beverage post-termination compensation under § 7.3 of the Agreement as a result of Hedinger's purported termination without cause. Central Beverage seeks damages to compensate for its lost profits and contractual damages for Hedinger's termination of the Agreement. On March 3, 2008, Hedginer answered and filed a counterclaim, which alleged that Central Beverage failed to use its best efforts to promote and sell DAD'S® products, failed to meet its minimum sales requirements, and failed to pay RCB for product it ordered, all in violation of the Agreement [6]. Hedinger's counterclaim is not the subject of the instant motions.

On July 10, 2008, Hedinger filed a motion for summary judgment on all allegations in Central Beverage's complaint [17]. On July 16, 2008, counsel for Central Beverage advised the Court that it needed certain discovery in order to respond to Hedinger's motion. Hedinger withdrew its motion and the parties engaged in discovery [21]. On January 27, 2009, Hedinger reinstated its motion [28]. Central Beverage, however, argued that it needed still more discovery, and the Court granted leave for Central Beverage to file a motion pursuant to Rule 56(f). (*Id*.). After briefing on the Rule 56(f) motion, the Court denied the motion and directed Central Beverage to respond to Hedinger's motion for summary judgment [40]. However, after receiving the parties' briefing on the summary judgment motion, the Court denied Hedinger's

motion without prejudice and allowed Central Beverage to conduct full fact discovery [45]. With fact discovery now complete, the parties have filed the instant motions.

## II.    Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

III.     Analysis

A.      Whether Hedinger Breached the Agreement

The first issue presented by the parties' motion is whether Hedginer breached the Agreement by selling DAD'S® products to to Integrity and Dalhstrom, with the understanding that those products would then be sold in Jewel/Osco stores in Central Beverage's territory.

Hedinger argues that the resolution of this question turns on the proper interpretation of § 1.0(a) of the Agreement.  The parties agree that Central Beverage's right to sell DAD'S® products in the territory was exclusive except that Hedinger could "sell Beverages to chain or multiple outlets with operations in the Territory and one or more operations outside the Territory (hereinafter called the "National Account Customers") for an invasion fee of $1.00 per case for the accounts listed in Appendix D."  (Agreement at § 1.0(a)).  Again, only Walgreens is listed in Appendix D.  Hedinger argues that this language is unambiguous and subject to only one reasonable interpretation: that Hedinger may sell to *any* "National Account Customer" in the territory, except that if it sells Beverages to Walgreens, Hedinger must pay Central Beverage a $1.00 invasion fee.  Hedinger argues that because Jewel/Osco meets the definition of a "National Account Customer," Hedinger was free to sell to it without having to pay the invasion fee.

Predictably, Central Beverage does not share Hedinger's interpretation of this provision.  Hedinger also argues that § 1.0(a) is unambiguous and subject to only one reasonable interpretation: that Walgreens was the *only* exception to its exclusivity rights in the territory, and that if Hedinger wished to sell Beverages to Walgreens, it was required to pay Central Beverage the $1.00 per case invasion fee.  Central Beverage argues further that under either interpretation of the Agreement, Hedinger was not permitted to sell DAD'S® products to competing distributors such as Integrity and Dalhstrom.  That is, Central Beverage argues that even if

Hedinger's interpretation were correct—and Hedinger could sell Beverages to any National Account Customer in the territory—the Agreement required Hedinger to do so directly (and not through another distributor).

In diversity cases such as this one, the Court applies federal procedural law and state substantive law. See *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Rules of contract interpretation are treated as substantive. *Bourke v. Dun & Bradstreet*, 159 F.3d 1032, 1036 (7th Cir. 1998). The parties agree that Illinois law governs the Court's interpretation of the Agreement.[8]

Under Illinois law, the Court's "primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* Moreover, "because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.*

If a district court determines that a contract is unambiguous, it may determine its meaning as a matter of law. *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1333 (7th Cir. 1988); see

---

[8] The Agreement, at § 8.5, contains a provision specifying that it "shall be construed in accordance with" the laws of Georgia. However, both parties have cited Illinois law in their briefs and throughout this litigation. Further, in its memorandum ([54] at 9 n.1), Hedinger states that it is not aware of a difference between the laws of Illinois and Georgia that would be dispositive to any issue in this case and asks the Court to apply Illinois law. While Central Beverage does not explicitly respond to Hedinger's request, it cites only to Illinois cases and cases applying Illinois law in its briefs. It is the parties' prerogative to ignore the Georgia choice of law clause in their Agreement and consent to Illinois law, and the Court will honor that decision.

also *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992) ("If an alleged written contract is unambiguous, the parties' intent is derived as a matter of law from the alleged contract itself.").  Conversely, "if the language of the contract is susceptible to more than one meaning, it is ambiguous."  *Gallagher*, 874 N.E.2d 4 at 58; see also *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.,* 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1st Dist. 1993) (A contract is ambiguous only if it is "reasonably and fairly susceptible to more than one construction.") (internal quotation marks and citation omitted).  An ambiguity is not created simply because the parties do not agree upon an interpretation.  *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 377 n.2 (7th Cir. 2000); *Fleet Business Credit, LLC v. Enerasys Networks, Inc.*, 816 N.E.2d 619, 662 (Ill. App. Ct. 1st Dist. 2004).

If a contract is ambiguous, a court may then (and only then) consider extrinsic evidence to ascertain the parties' intent.  *Id.*  "[I]t is the general rule that questions of contractual ambiguity are given to the trier of fact, together with the evidence necessary to resolve them," *Continental Cas. Co. v. Northwestern Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005), and accordingly such questions are not susceptible to decision at the summary judgment stage.  However, "[a]n exception to this general rule is that 'if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed,' and summary judgment is therefore appropriate in such cases."  *Id.* (quoting *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995)).  Similarly, if parties do not point to relevant extrinsic evidence at summary judgment, a court can properly choose "the most plausible reading of an ambiguous contract."  *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir. 2010) (citing *N.E. Communications of Wis., Inc. v. CenturyTel, Inc.,* 516 F.3d 608, 611 (7th Cir. 2008) ("When only the contract's language is in evidence, however, a

court renders its own decision whether or not the document is ambiguous."). "That rule is in keeping with the numerous cases from this circuit that teach that summary judgment is the 'put up or shut up' moment in the life of a case." *Id*. (citing *Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 476 (7th Cir. 2010)). The rule also accords with the principle that "[t]he interpretation of a contract is an issue particularly well-suited for resolution by summary judgment." *Baker*, 58 F.3d at 326.

With these principles in mind, the Court agrees with Central Beverage and concludes that Hedinger breached the Agreement by selling DAD'S® products to Integrity and Dalhstrom with the understanding that those products would then be sold in Jewel/Osco stores in Central Beverage's territory.[9] This outcome is compelled by the unambiguous language of the relevant portions of the Agreement. However, as explained below, even if the Court had determined that § 1.0(a) were ambiguous, the Court would still enter summary judgment in Central Beverage's favor on this issue.

First, reading the contract as a whole, the Court concludes that the Agreement is reasonably and fairly susceptible to only one construction—that Central Beverage's right to distribute DAD'S® products in the territory was exclusive, with the exception that Hedinger could sell to the National Account Customers listed on Appendix D (Walgreens only), and only then if it paid a $1.00 per case invasion fee. Again, the key language is that Central Beverage's right to sell DAD's® products is exclusive except that Hedinger "reserves its right to sell Beverages to chain or multiple outlets with operations in the Territory and one or more operations outside the Territory (hereinafter called the "National Account Customers") for an

---

[9] There is no suggestion that Hedinger did not intend for Dalhstrom and Integrity to sell the DAD'S® products to Jewel/Osco locations in Central Beverage's territory, or that Hedinger was unaware of the products' destination.

invasion fee of $1.00 per case for the accounts listed in Appendix D." (Agreement at § 1.0(a)). There is no punctuation before or within the phrase "for an invasion fee of $1.00 per case for the accounts listed in Appendix D." This strongly suggests that the sentence was intended to be read as a continuous whole, with both of the later phrases each modifying "right to sell." Accordingly, the contract prohibited Hedinger from allowing DAD'S® products to be sold in Jewel/Osco locations in Central Beverage's territory.[10]

In any event, even if the Court had accepted Hedginer's interpretation of § 1.0(a) of the Agreement, Hedinger still would have been in breach. Under Hedinger's interpretation, the Agreement would have permitted "the Company" (i.e., Hedinger) to "sell Beverages to * * * National Account Customers" such as Jewel/Osco without being required to pay an invasion fee. But of course, Hedinger did not sell the DAD's® products at issue "to * * * [a] National Account Customer[ ]"; instead Hedinger sold the products to competing distributors, who then sold them to Jewel/Osco. The plain language of the agreement did not permit such an action.

---

[10] Because the Court determined that § 1.0(a) of the Agreement is unambiguous, it did not consider the extrinsic evidence submitted by Central Beverage in reaching its conclusion. *Gallagher*, 874 N.E.2d at 58. However, even if the Court had determined that § 1.0(a) of the Agreement were ambiguous, summary judgment for Central Beverage regarding the proper interpretation of § 1.0(a) would still be appropriate. To explain, Hedinger did not introduce any extrinsic evidence relevant to the interpretation of the Agreement. Further, whenever Central Beverage attempted to introduce extrinsic evidence—for example, regarding the general nature of exclusivity agreements or invasion fees in the beverage distribution industry—Hedinger responded by arguing that the evidence is "not relevant to the interpretation of the specific unambiguous language in Section 1.0(a) of the Agreement between the parties." See, *e.g.* ([65] at ¶¶ 17-23); see also *Id.* at ¶¶ 24, 25 ("The invasion fee at issue in this case is defined by the four corners of the Distributor's Agreement"). Accordingly, the only extrinsic evidence in this case relevant to the interpretation of the Agreement is either not properly before the Court or tends to support Central Beverage's interpretation. There certainly are no factual disputes regarding any piece of extrinsic evidence that would preclude summary judgment. *Continental Cas. Co.*, 427 F.3d at 1041. To the contrary, Hedinger submits that "there is agreement among the parties that the issues in this case are susceptible to judgment as a matter of law." ([64] at 2). Accordingly, under the circumstances here, even if § 1.0(a) were ambiguous, the Court would be put in the position of choosing "the most plausible reading of [the] ambiguous [provision]," *In re Airadigm Communications, Inc.*, 616 F.3d at 657, which as explained above is the reading advanced by Central Beverage.

In its briefs, Hedinger argues that whether it sold products to Jewel/Osco directly or through Dalhstrom and Integrity is a "distinction without a difference" as the products were headed to Jewel/Osco in any event. ([59 at 9]; see also [64] at 5-6 ("Dalhstrom and Integrity were merely conduits through which product flowed to a National Account. As such, sales to them can be no more violative of Hedginer Brands' obligations to Central Beverage than sales directly to Jewel/Osco."). The Court respectfully disagrees with Hedinger's position. As explained above, Hedinger's position is not supported by the plain language of § 1.0(a). Furthermore, even if the Agreement had carved out all National Account Customers for Hedinger, it does not necessarily follow that Hedinger would be free to utilize any distributor it wanted in order to service them. Exclusivity agreements are valuable not only because they give the distributor the right to sell a product within a certain area, but also because they strip the distributor's competition of the opportunity to sell that product and profit thereby. By selling DAD's® products to Integrity and Dalhstrom, Hedinger was bolstering Central Beverage's competition, thereby causing Central Beverage indirect harm.

The next issue involves the lost profits that Central Beverage seeks as compensation for Hedinger's breach of the Agreement's exclusivity provisions. In its complaint, Central Beverage alleges that it generated a profit of approximately $2.60 per case of liter products, and seeks that amount for every case of DAD's® products sold to Jewel/Osco during the relevant time period. (See Cmplt. at ¶ 10). Hedinger argues that lost profits are unavailable because Central Beverage "*could not* have made those sales to Jewel/Osco." ([54] at 10) (emphasis in original). According to Hedinger, Central Beverage has admitted that Jewel/Osco would not have purchased DAD's® products from them, because Jewel/Osco was at that time only doing business with Integrity. (*Id.*).

Under Illinois law, "in order to recover for breach of contract, a plaintiff must establish both 'that he sustained damages * * * [and] he must also establish a reasonable basis for computation of those damages.'" *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 632-33 (7th Cir. 2007) (quoting *Ellens v. Chicago Area Office Fed. Credit Union,* 576 N.E.2d 263, 267 (Ill. App. Ct. 1st Dist. 1991)). "Illinois courts have stated that '[l]ost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the lost profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into.'" *Id.* (quoting *Milex Prods., Inc. v. Alra Labs., Inc.,* 603 N.E.2d 1226, 1235 (Ill. App. Ct. 2d Dist. 1992)); see also *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 770 N.E.2d 177, 199 (Ill. 2002) ("the law does not require that lost profits be proven with absolute certainty. Rather, the evidence need only afford a reasonable basis for the computation of damages which, with a reasonable degree of certainty, can be traced to defendant's wrongful conduct."). Because damages are an element of a breach of contract claim, summary judgment is appropriate against a plaintiff who cannot demonstrate that it could prove damages. *Id.*

In this case, the Court concludes that it was not impossible for Hedinger to have run its sales to Jewel/Osco of DAD'S® products through Central Beverage. First, Ms. Spagnola did not "admit" that Jewel/Osco would have refused to purchase beverages from Central Beverage during the relevant time period. While Ms. Spagnola, in her deposition, did answer "correct" to the question "[Jewel/Osco] would not buy from you directly?" a few pages later, Ms. Spagnola clarified that while Jewel/Osco was attempting to centralize all of its beverage distribution in Dahlstrom/Integrity, a number of beverage companies such as Monster, LaCroix, and Everfresh refused to transfer their business and continued to use Central Beverage to distribute their

products to Jewel/Osco. That Jewel/Osco did purchase alcoholic and nonalcoholic beverages from Central Beverage during the relevant time period belies Hedinger's assertion that Jewel/Osco was *only* doing business with Dahlstrom/Integrity. But most importantly, even if it were true that Jewel/Osco would only do business with Dalhstrom or Integrity, Hedinger does not explain why it could not have simply sold DAD'S® products to Central Beverage, which then could have distributed them to Dahlstrom or Integrity for later sale to Jewel/Osco.

The cases cited by Hedinger to support its argument that Central Beverage cannot establish damages are inapposite. In *TAS Distributing Co. Inc.*, the Seventh Circuit rejected a claim for lost profits for a new product line as too speculative and uncertain. 491 F.3d at 633. Similarly, in *Midland Hotel Corp. v. Reuben H. Donnelly Corp.*, 515 N.E.2d 61, 66 (Ill. 1987), the Illinois Supreme Court held that the damages claimed by plaintiff were too speculative to be recoverable (it was unclear that the defendant's failure to publish an advertisement in their Yellow Pages directory was the cause of the plaintiff's sales decline). Here, by contrast, the damages that Central Beverage is attempting to recover are not speculative. Instead, it seeks to recover its profit margin on each case of products that was actually and wrongfully sold in its territory, a well-accepted theory of recovery. See, *e.g. Oakleaf of Illinois v. Oakleaf & Associates, Inc.*, 527 N.E. 2d 926, 933 (Ill. App. 1st Dist. 1988) ("Violations of exclusive sales contracts can be recompensed by a damage award based on the amount of sales made by a competitor in the identified territory * * *"); *Inscero Mfg. Inc. v. Amsco Corp.*, 1985 WL 5078, at *3 (N.D. Ill. Dec. 23, 1985) ("The proper measure of damages for breach of an exclusive distributorship agreement is the lost profits which would have accrued to the distributor had the contract been observed.") (citing cases).[11] The number of cases sold by Integrity and Dalhstrom

_____

[11] Hedinger contends (in a footnote of its reply in support of its motion) that "[e]ven assuming that Central Beverage's interpretation of Section 1.0 of the Agreement were accurate, and that Hedinger

to Jewel/Osco in Central Beverage's territory during the relevant time period certainly appears to be an ascertainable figure.

In the last case cited by Hedinger, *Continental Leavitt Communications, Inc. v. Painewebber, Inc.*, 1994 WL 710745. at *10 (N.D. Ill. Dec. 20, 1994), it was undisputed that the plaintiff would not have profited from a disputed transaction regardless of the defendant's conduct. Here, as discussed above, Central Beverage could establish that it would have profited if it had been given the opportunity to sell DAD'S® products to Jewel/Osco. Because Central Beverage can establish that it is entitled to lost profits due to Hedinger's breach of the Agreement, summary judgment against Central Beverage on this aspect of its claim is not appropriate. Central Beverage must establish the precise amount of its lost profits at trial.[12]

## B. Whether Hedinger Properly Terminated the Agreement

Central Beverage's second claim is for liquidated damages pursuant to § 7.3 of the Agreement, which provides Central Beverage with damages in the event of a wrongful and early termination by Hedinger. Central Beverage argues that it is owed damages under the formula specified in § 7.3 because Hedinger terminated the Agreement without cause and for a reason other than "those listed in sections 7.0, 7.1, or 7.2." (See Agreement at § 7.3). The Court concludes that because Central Beverage failed to pay RCB (a company approved source) for a

---

Brands breached as a result, the appropriate measure of damages would be the $1.00 per case invasion fee." ([70] at 10 n.6). The Court disagrees. Central Beverage would be owed the $1.00 per case invasion fee only if Hedinger had sold product to Walgreens but had failed to pay the required fee. Because Hedinger was not permitted to sell DAD'S® products to Jewel/Osco, the $1.00 invasion fee provision in Section 1.0(a) is inapplicable.

[12] To be clear, simply showing the number of cases of DAD'S® products that Hedinger sold to Integrity and Dalhstrom for distribution to Jewel/Osco will not establish the amount of Central Beverage's damages, as some of the cases that Hedinger sold to Integrity and Dalhstrom were re-sold to Jewel/Osco stores outside the territory. Central Beverage must establish how many cases were sold to Jewel/Osco locations *within* its territory, and its expected profit margin for each case.

shipment that it ordered and received, Hedinger was entitled to terminate the Agreement pursuant to § 7.2(d), which allowed Hedinger to terminate for "[f]ailure of the Distributor to pay the Company approved source the price or prices of the Beverages." Central Beverage admits that it "refuse[d] to pay for a single load of product" from RCB, but argues that this refusal "was done in an effort to minimize its losses" and that Hedinger's "first material breach" excused Central Beverage's obligation to pay for the shipment. ([67] at 14). For the reasons explained below, Central Beverage's argument that it was entitled to withhold payment to RCB fails as a matter of law.

First, Hedinger's "first material breach" did not excuse Central Beverage's obligation to pay for product that it ordered. Under Illinois law, a material breach by one party to a contract discharges the other party from performing its obligations. See, *e.g. Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 537 (Ill. App. 1st Dist. 2000); *Dragon Construction, Inc. v. Parkway Bank & Trust,* 678 N.E.2d 55, 58 (Ill. App. 1st Dist. 1997). Accordingly, if Hedinger's breach was "material"—a "complicated question of fact," *William Blair and Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 779 (Ill. App. 1st Dist. 2005)— then Central Beverage would doubtlessly have been entitled to repudiate the contract and cease performance. See, *e.g. Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 212 (7th Cir. 1979) ("A non-breaching party faced with the dilemma of whether to perform in the face of the other party's breach may elect to avoid the contract or treat the contract as in full force and retain the right to sue for damages arising from the breach."). But that is not what happened. Instead, despite learning of Hedinger's breach as early as the spring of 2007, Central Beverage continued to order and sell DAD'S® products—something it would not have been able to do had it considered the contract to be terminated. In fact, in an e-mail dated October 31, 2007, Ms.

Spagnola (Central Beverage's president) told Hedinger's president that "it is our position [that] the agreement remains in full force." "Where a contract is breached in the course of its performance, the injured party has a choice presented to him of continuing the contract or refusing to go on. If he chooses to continue performance, he has doubtless lost his right to stop performance." *South Beloit Elec. Co. v. Lar. Gar Enterprises, Inc.*, 224 N.E.2d 306, 310-311 (Ill. App. 2d Dist. 1967) (citing 5 WILLISTON ON CONTRACTS § 683 (3d ed. 1961)); see also *Kentucky Natural Gas Corp. v. Indiana Gas & Chemical Corp.*, 129 F.2d 17, 20 (7th Cir. 1942) ("Defendant, upon attempted repudiation by plaintiff, had the right to treat the contract as still in force and to sue for damages for nonperformance then or later, but having insisted that the agreement remained effective, it must perform its part."). Because Central Beverage chose not to terminate the contract—and indeed expressly reaffirmed its view that "the agreement remains in full force"—it was not absolved of its duty to fully perform.

Central Beverage cites a number of cases that stand for the proposition that if "a party has *materially* breached a contract, he cannot take advantage of terms of the contract which benefit him." *McBride v. Pennant Supply Corp.,* 623 N.E.2d 1047, 1051 (5th Dist. 1993) (emphasis in original) (quoting *Robinhorne Construction Corp. v. Snyder,* 251 N.E.2d 641, 645-46 (Ill. App. Ct. 4th Dist. 1969)); see also *Kosuga v. Kelly*, 257 F.2d 48, 55 (7th Cir. 1958) ("it is a well established principle that a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party."). These cases may have some bearing on Hedinger's ability to recover damages for breach of the Agreement (but again, the merits of Hedinger's counterclaim are not before the Court at this time). But the cases to which Central Beverage cites do not establish that a party that has materially breached a contract cannot properly terminate the contract under its terms once the other party commits a breach of its own.

Second, even if Central Beverage properly believed that Hedinger had breached their distribution agreement, Central Beverage was not entitled to "mitigate its damages" or "offset some of its mounting losses" ([69] at 10) by refusing to pay RCB. Under Illinois law, "a buyer must pay for the goods it accepts." *ECHO, Inc. v. Whitson Co.,* 52 F.3d 702, 705 (7th Cir. 1995) (citing 810 ILCS 5/2-206(1)). The Illinois Uniform Commercial Code (UCC) provides, however, that "[t]he buyer * * * may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the *same* contract." 810 ILCS 5/2-717 (emphasis added). But, under Illinois law, "distributorship agreements and the purchase orders that arise under them are different contracts. Therefore, the price of the goods a buyer accepts pursuant to a purchase order is not susceptible to set-off against damages the buyer sustains as a result of a seller's alleged breach of a related distributorship agreement." *Echo, Inc.*, 52 F.3d at 705; see also *To-Am Equipment Co., Inc. v. Mitsubishi Caterpillar Forklift America*, 913 F. Supp. 1148, 1155 (N.D. Ill. 1995). Accordingly, under Illinois law, even if Central Beverage had ordered the goods from Hedinger itself, it would have been required to pay for them. But in this case, the involvement of a third party vendor makes it even clearer that the contracts at issue are different and not susceptible to a set-off. The distributorship agreement is between Central Beverage and Hedinger, yet Central Beverage purchased beverages from and refused to pay RCB.

One final point: Central Beverage argues throughout its briefs that Hedinger never wanted to contract with it, and is now using its failure to pay RCB merely as a pretense to end the parties' relationship. Hedinger's real motivation for terminating the Agreement is irrelevant to the disposition of the instant motions. By failing to pay RCB, Central Beverage triggered one of the conditions by which Hedinger was entitled to terminate the Agreement without paying

early-termination damages. (Agreement at § 7.2(d)). Central Beverages is not entitled to damages for wrongful termination pursuant to § 7.3.

## IV. Conclusion

For the foregoing reasons, and in the manner described above, Hedinger's motion for partial summary judgment [53] and Central Beverage's motion for partial summary judgment [58] are each granted in part and denied in part.

Dated: March 28, 2011                    _____

                                         Robert M. Dow, Jr.
                                         United States District Judge